UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

KIERRA THOMAS, ET AL,              *      Docket No. 18-4373
                                   *
                 Plaintiffs,       *
                                   *
VS                                 *      March 13, 2019
                                   *
RANDALL CHAMBERS, ET AL,           *
                                   *
                 Defendants.       *      Section R
                                   *

*****************************************************************

           REPORTER'S OFFICIAL TRANSCRIPT OF THE MOTIONS HEARING
              BEFORE THE HONORABLE KAREN WELLS ROBY,
                 UNITED STATES MAGISTRATE JUDGE.

*****************************************************************

**APPEARANCES**:

For the Plaintiffs:                Motta Law Firm, LLC
                                   BY: VANESSA MOTTA
                                   855 Baronne St., 2nd Floor
                                   New Orleans, LA  70113


For the Defendants:                Perrier & Lacoste, LLC
                                   BY: DUSTIN POCHE
                                   365 Canal St., Ste. 2550
                                   New Orleans, LA  70130


**TRANSCRIBED BY:**    Mary V. Thompson, RMR, FCRR
                       500 Poydras Street, Room 275
                       New Orleans, Louisiana  70130
                       (504)589-7783

**OFFICIAL TRANSCRIPT**

**P R O C E E D I N G S**

1
2                              (Call to order of the court.)
3       THE COURT:  Good morning.
4       So the only matter we have involves *Thomas v Chambers*.
5       Let me say at the outset Record Document 40, which is a
6   motion for leave for the Court to propound additional
7   interrogatories, that motion -- let me make sure that's the one.
8       Yeah, that motion is denied for non-compliance with 7.4
9   of the local rules, so we have two motions left.
10      Let's start off with Record Document 42.
11      And this is the defendant's motion to compel the
12  plaintiffs to respond to the second set of interrogatories.
13      MR. POCHE:  Good morning, Your Honor.  Thank you.
14      This is Dustin Poche on behalf of the defendants in
15  this case.  I believe we're on Record Doc 40.  Is that correct,
16  Your Honor?
17      THE COURT:  Doc 42.  I already denied 40 for
18  non-compliance with Local Rule 7.4.
19      MR. POCHE:  Your Honor, this is a motion to compel
20  discovery responses in response to a second set of
21  interrogatories relating to payments made to Dr. Liechty,
22  Dr. Jolly, and Dr. Lonseth.  They are copied --
23      THE COURT:  Payments made by whom?
24      MR. POCHE:  The attorneys.
25      THE COURT:  The attorneys are not parties in the case.

**OFFICIAL TRANSCRIPT**

1    By what authority do you think you can compel them?

2            MR. POCHE:  Yes, Your Honor.  There is a case on point,

3    *Norfolk* --

4            THE COURT:  Is that a Danny Knowles case?

5            MR. POCHE:  Say it again.

6            THE COURT:  Judge Knowles?

7            MR. POCHE:  No, Your Honor.  I believe that's actually

8    a case out of -- not out of Louisiana.  It's out of Florida.

9            THE COURT:  Okay.

10           MR. POCHE:  There was a case --

11           THE COURT:  What's the name of that case?

12           Brian, go get my iPad.  Let me pull it up.

13           Tell me the name.

14           MR. POCHE:  It's *Norfolk*.  I only have the first name

15   on that note, Your Honor.  Give me one second.

16           THE COURT:  It's in the submission you gave?

17           MR. POCHE:  Yes, Your Honor.

18           THE COURT:  All right.  I'll find it.

19           MR. POCHE:  It's *Norfolk v* -- I have the Westlaw

20   citation.  It's 2012 WL 3055675.

21           THE COURT:  Whoa, whoa, whoa, whoa.  305567 what?

22           MR. POCHE:  -75.

23           THE COURT:  I did okay.  I don't know, I thought you

24   were running away with me here.

25           MR. POCHE:  Judge, do you want me to wait while you

**OFFICIAL TRANSCRIPT**

1    look it up or continue?

2        THE COURT:  No, I have it right here.

3        MR. POCHE:  Okay.

4        In that case, Judge, the Court of conclusion said when

5    a party is engaged in the discovery to obtain facts with which to

6    assault the credibility of an opponent's expert witness, they

7    make seek the information from multiple sources including the

8    expert, the party, the party's insurance company, or the attorney

9    for the party.

10        THE COURT:  Let me tell you this -- let me ask a

11    question first because I haven't pulled up the case yet.

12        What was the discovery tool utilized in that case?  Was

13    it a subpoena to the lawyer?  Because the lawyer is not a party

14    and discovery only applies as between parties.

15        And just because judges make decisions don't mean they

16    made them right.

17        MR. POCHE:  Understood, Your Honor.

18        THE COURT:  So tell me about *Norfolk*.  Tell me, what

19    was the discovery tool that was utilized?

20        MR. POCHE:  In my understanding, Judge, it was a set of

21    interrogatories issued --

22        THE COURT:  So they propounded -- hear me.  Hear me --

23    propounded interrogatories to a non-party?

24        MR. POCHE:  To --

25        THE COURT:  To the lawyer?

**OFFICIAL TRANSCRIPT**

1      MR. POCHE:  Correct.  To the --

2      THE COURT:  By what authority?

3      MR. POCHE:  Well, what authority allows that discovery?

4      THE COURT:  Yeah.

5      MR. POCHE:  You know, there are other cases,

6  Your Honor, besides the *Norfolk* case that were cited to where

7  that was allowed such as --

8      THE COURT:  You're not hearing me.  I don't care if

9  judges keep doing it all wrong, this judge ain't going to do it

10 wrong.

11     MR. POCHE:  Well, I --

12     THE COURT:  You would agree with me that discovery

13 applies to the parties?

14     MR. POCHE:  Yes.

15     THE COURT:  Yes.

16     You would agree with me that a lawyer representing a

17 party is not a party?

18     MR. POCHE:  Correct.

19     THE COURT:  By what authority, then, should I compel a

20 lawyer, who is not before the jurisdiction of this Court as a

21 party, to give you information out of their files?

22     MR. POCHE:  I would say jurisprudence authority, Judge,

23 is what I'm relying on to request this Court --

24     THE COURT:  All right.  Go ahead.  I'm listening.

25     MR. POCHE:  -- to request this Court to issue an order

**OFFICIAL TRANSCRIPT**

1  regarding --

2          THE COURT:  Despite the fact that this judge thinks

3  everybody is crazy and wrong, because I think it's wrong.  I

4  think -- let me tell you what I think is going on.

5          I think that young people who work for judges see rules

6  of law or decisions made without thinking through the process.

7  Right?

8          So I read the opinion by Judge Knowles -- which again I

9  disagree with.  Because I'm sitting there saying how can Danny

10 compel a plaintiff's lawyer to respond to discovery when

11 discovery only applies to parties and the lawyer was not sued?

12 That's a wrong opinion.

13         Now, I don't get to reverse him, but I sure as heck

14 don't have to follow him.

15         MR. POCHE:  Understood, Your Honor.

16         THE COURT:  So let me see this *Norfolk* case that you

17 reference.  Hold up.

18                          (A pause in the proceedings.)

19         THE COURT:  Norfolk versus who?  Western?  No?

20         MR. POCHE:  Norfolk v -- I'm going to spell it --

21 C-a-m-p-a-r-a-t-o.  Southern District of Florida 2012.

22         THE COURT:  Got it.  Because I would pull up my Lexis

23 and not my Westlaw, right, so I couldn't use what you gave me.

24         MR. POCHE:  I use Westlaw, Your Honor.

25         THE COURT:  Yeah.  I have both, but...

**OFFICIAL TRANSCRIPT**

1          So here's the problem I've got.

2          MR. POCHE:  Yes, Your Honor.

3          THE COURT:  Jim Hopkins is a friend of mine out of

4  Florida, but I disagree with him.

5          MR. POCHE:  Understood, Your Honor.

6          THE COURT:  Right?  I don't think he looked at it from

7  the standpoint of it's the lawyer's stuff that they're asking

8  for, not the witness's.

9          I would agree with you that if you wanted to find out

10  about a bias of a witness, the proper thing to do is to subpoena

11  the witness's records to see the extent of the relationship

12  between the witness and the lawyer, but I think everybody is

13  getting this all twisted and is ignoring the rules that say the

14  discovery rules are limited between the parties.

15          And y'all are taking lawyers who are not parties and

16  y'all are making them do stuff?  That could come back and bite

17  you on the butt.  That's a bad thing.

18          You see why I've got a problem?

19          MR. POCHE:  I understand, Your Honor.

20          THE COURT:  I don't care about all these people who

21  just went and straight looked at the request.  Nobody considered

22  who the recipient of the documents were of the request, right?

23  Everybody just assumed, because the lawyer propounded

24  interrogatories, it must be between the parties.

25          That was the thing I got stuck on last night.  How

**OFFICIAL TRANSCRIPT**

1  could you even do this?

2       MR. POCHE:  Well, I don't think I could say anything,

3  Your Honor, to persuade you to go into my --

4       THE COURT:  Unless you've got a case that tells me

5  despite that a lawyer is not a party to the matter, it's okay to

6  send interrogs to them in a request.  I don't think there's any

7  proper authority for that.

8       MR. POCHE:  And I'm going to look again, Your Honor, to

9  see what Judge Shushan said in her order in the *Williams* case,

10  but I don't --

11       THE COURT:  Give me Shushan's case.  Because Shushan

12  might have missed it, too.  Everybody might have missed the fact

13  that -- what case is that?

14       MR. POCHE:  It's *Williams v Freddie Taylor*.  I had the

15  order attached, Judge, as Exhibit 8 to my motion.

16       THE COURT:  Eight.  Okeydokey.

17       So in this case, Sally was dealing with discovery

18  propounded to the plaintiff for the financial records between the

19  plaintiff's lawyers and her doctors.

20       MR. POCHE:  Yes, Your Honor.

21       THE COURT:  So this discovery was propounded to a party

22  for the production of her lawyer's records.  That's what it says.

23       It says -- which is, again, kind of crazy to me, but

24  "The Westfield defendants seeking an order requiring Williams,"

25  who was the plaintiff -- let me double-check.

**OFFICIAL TRANSCRIPT**

1          -- who was the plaintiff "to provide complete responses

2    to interrogatories concerning the financial relationship between

3    Williams' lawyers and her doctors in this case.  The defendant

4    suggests that Williams first went to her lawyers who referred her

5    to a doctor to whom their clients are frequently referred."

6          So this discovery that Judge Shushan -- I see why she

7    did it, right?  Because that discovery was directed to the party

8    but asked for the client's records, which is a real interesting

9    twist.

10          MR. POCHE:  Judge, I'll submit that I did -- I believe

11    I did the same thing in this case.  I submitted the discovery to

12    plaintiffs asking for information that was in their attorneys'

13    possession.  I --

14          THE COURT:  That are not related to the plaintiff, that

15    are related -- I understand what you're saying.  You're saying,

16    "I mirrored Judge Shushan."

17          MR. POCHE:  Yes, Your Honor.

18          And I pointed to Page 3, Your Honor, where it says,

19    "The responses to the" --

20          THE COURT:  I'm read.  I'm reading.

21          MR. POCHE:  I will not interrupt.

22                              (A pause in the proceedings.)

23          THE COURT:  That's an end-around.

24          So the only thing that she's seemingly authorized --

25    and I'm interpreting this -- is a listing of three years of

**OFFICIAL TRANSCRIPT**

1    information that shows the relationship between the parties, but

2    you don't get to know -- she doesn't say that -- let's see.

3        You can't -- "You don't get to know if they paid less

4    than the face amount of the doctor's bills or whether counsel for

5    Williams represented the doctors, their families, or their office

6    staff."

7        MR. POCHE:  Yes, Your Honor.  I did not propound those

8    interrogatories in this case.  My specific request was amounts

9    paid or distributed from operating or trust accounts to

10    Dr. Liechty, to Dr. Jolly, and I also indicated the names Vital

11    Statistics and other --

12        THE COURT:  Why didn't you ask that of the doctor?

13        MR. POCHE:  I deposed Dr. Lonseth and I deposed

14    Dr. Liechty.  Both didn't know and referred me to additional

15    people in the practice which may know, and they don't know if I

16    can get the information from them.  I have issued subpoenas to

17    them for payment information related to --

18        THE COURT:  Why wouldn't they know?  Did you ask them

19    why don't they know?  Did you ask them how frequently is it that

20    you evaluate people who have a connection with this firm?

21        MR. POCHE:  I asked that, Your Honor, to Dr. Liechty

22    most recently.  I don't remember the response from Dr. Lonseth.

23    I wasn't the attorney that took it.

24        But I asked Dr. Liechty in particular if he had other

25    cases with Ms. Motta.  He said "yes."  I asked him who has the

**OFFICIAL TRANSCRIPT**

1    information that I asked.  He said it could be Eric with his

2    office.

3        THE COURT:  Who is Eric?

4        MR. POCHE:  He's an employee of another company called

5    Integrated Health Management.

6        THE COURT:  And what does he do?

7        MR. POCHE:  He's kind of the office manager for

8    Dr. Liechty.  Dr. Liechty --

9        THE COURT:  Why didn't you do a corporate deposition of

10   the medical practice and particularly talk to that Eric guy about

11   that -- put him on notice that you want to know about how many

12   cases they were referred from this firm?

13       MR. POCHE:  Your Honor, I will do that.  I deposed

14   Dr. Liechty on the 13th.  The discovery deadline is on the 18th

15   in this case.  Dr. Liechty told me that it could be Eric or it

16   could be Nathaniel Graff that had the information.  Nathaniel

17   Graff is Eric's boss.  So it's going to be --

18       THE COURT:  So it doesn't matter to you who they

19   produce as long as they give you the information.

20       Here's the deal.  I don't agree with what any of these

21   people did -- not even Sally.  I think Sally came the closest to

22   being right, but I have problems with what you're doing.

23       I don't have an issue with you asking the purported

24   expert witness how often you get this and how much you make from

25   this and all that.  Right?  I'm thinking it's valid to go that

**OFFICIAL TRANSCRIPT**

1  way.

2          But this is -- this is wrong that you are using -- even

3  in this context, you're using the plaintiff to get information

4  out of the lawyers' administrative record, because it's not

5  necessarily privileged information, but I don't think that's the

6  right vehicle.  And at least with me -- my other colleagues may

7  say they don't care, but he's not a party or she's not a party,

8  and it's a way to do an end-around on stuff that you can't get

9  directly.

10          Let me ask you this:  If you sent the subpoena directly

11  to them, what do you think they would do?

12          MR. POCHE:  What do I think Liechty would do?

13          THE COURT:  The plaintiffs' lawyers would do if you

14  sent a subpoena to them for information with regard to their

15  relationship between them and whomever?

16          Would there be a way for them to quash it?

17          Because, see, that might be the right tool to use,

18  because Rule 45 applies to non-parties.  But when you use

19  interrogatories, they are only limited to parties, and the

20  lawyers are not parties.  And for whatever reason, my colleagues

21  are not seeing this.

22          I can't let you do it.

23          MR. POCHE:  I understand, Your Honor.  I have no other

24  cases to point you to besides what was cited in the brief in

25  support of my position.

**OFFICIAL TRANSCRIPT**

1          THE COURT:  And they are all following one another and

2     they are all citing one another, and nobody's thinking about is

3     this interrogatory really asking for information from a party or

4     is it asking for information from a non-party to the detriment of

5     a party?

6          I don't care if the information is harmful to the party

7     if you get it the right way.  I don't think this is the right

8     way.  Either a 30(b)(6) or a Rule 45, but rogs and requests is

9     the wrong way.  So, sorry.

10          MR. POCHE:  Thank you, Your Honor.

11          THE COURT:  All right.  The last motion is 46.

12          MR. POCHE:  Judge, Document 46 is a motion to compel

13     discovery.  Specifically, a set of discovery from the first set

14     of interrogatories -- well, actually requests for production

15     regarding social media.

16          And it's also combined with a motion to compel

17     responses to a second set of -- or a third set of

18     interrogatories, second request for admissions, and fourth set of

19     requests for production of documents.

20          THE COURT:  All right.  So let's start off with the

21     easy one, the request for admissions.

22          MR. POCHE:  Okay.

23          THE COURT:  That's the easy one.

24          MR. POCHE:  All right.

25          Judge, I propounded, I believe, in this case I think 17

**OFFICIAL TRANSCRIPT**

1    requests for admission, and I'm particularly looking at -- let me
2    turn to that page.
3            I'm looking at documents that I believe could show
4    identification of specific phone numbers in relationship to
5    specific people.
6            THE COURT:  But didn't Judge Vance deny -- or dismiss
7    for lack of -- I think that's the more proper term, dismiss the
8    purported fraud claims?
9            MR. POCHE:  She did, Your Honor.
10            THE COURT:  So what makes this relevant?
11            In the confines of the case that I am left with
12    evaluating, how is this area of inquiry probative of an issue
13    that remains in this case?
14            MR. POCHE:  Yes, Your Honor.  I gave you one example of
15    why something like that would be relevant.  Specifically, I
16    deposed Antoine Clark and Shirley Harris.  Ms. Harris admitted to
17    talking to Ryan Harris.  I don't know if I asked her specifically
18    on the day of the accident, but she admitted to it.
19            I asked Mr. Clark --
20            THE COURT:  I'm sorry.  Who are they?
21            MR. POCHE:  Who is Ryan Harris?
22            THE COURT:  Yeah, yeah, yeah.
23            MR. POCHE:  He is a plaintiff involved in an accident
24    on March 29, 2017, in Orleans Parish involving multiple people
25    and a commercial 18-wheeler.

**OFFICIAL TRANSCRIPT**

```
1              THE COURT:  Okay.
2              MR. POCHE:  Ryan Harris is the cousin of
3    Shirley Harris, the plaintiff in this case.
4              THE COURT:  So let me tell you what I see you doing.
5              You're using this case as a means of acquiring evidence
6    for a case to come or -- because it's not as a defense to the
7    claim, because the fact that they talked has no bearing on this
8    claim.
9              So what you're doing is you're using this case to
10   acquire information to be used later, either criminally or
11   civilly, that is not connected to the claim that Judge Vance says
12   I'm supposed to help you get information on.
13             MR. POCHE:  Well, first, Your Honor, I don't have
14   anything to do with any criminal investigations.
15             THE COURT:  No, that's called a referral to the
16   U.S. Attorney.  I see where this is going.  I've been here
17   20 years.
18             But anyway, my point is -- let me ask the question
19   directly.
20             MR. POCHE:  Yes, Your Honor.
21             THE COURT:  Relevancy and proportionality.
22             MR. POCHE:  Yes.
23             THE COURT:  Tell me why.
24             MR. POCHE:  First of all, it is relevant because
25   Mr. Harris' accident happened before our accident.
```

**OFFICIAL TRANSCRIPT**

1            THE COURT:  Got it.

2            MR. POCHE:  It happened on March 29, 2017.

3            I specifically questioned both plaintiffs about their

4 communication with Mr. Harris.  One of the plaintiffs denied it.

5 Therefore, it goes to his credibility and impeachment, the fact

6 that he denied communications with another person.

7            Secondly --

8            THE COURT:  And why does it matter that they

9 communicated anyway --

10            MR. POCHE:  The timing --

11            THE COURT:  -- in this case?

12            MR. POCHE:  The timing of it, Judge.

13            THE COURT:  How so?

14            MR. POCHE:  Because the accident happened around

15 8:00 p.m.  The cellphone records indicate immediate communication

16 with Mr. Harris before the accident and after the accident.

17 Mr. Harris was involved in a similar accident and he treated with

18 similar medical providers.

19            THE COURT:  But how does that relate to this case?

20            Who's my claimant?

21            MR. POCHE:  Shirley Harris, Antoine Clark, and

22 Kierra Thomas.

23            THE COURT:  So is Shirley Harris the wife of the other

24 Harris?

25            MR. POCHE:  Ryan Harris is a cousin of Shirley Harris.

**OFFICIAL TRANSCRIPT**

1          THE COURT:  Okay.  So that's like me picking up the

2    phone and calling my cousin when I'm in an accident.  The fact

3    that I call my cousin when I'm in an accident, how does that

4    relate to the accident?

5          MR. POCHE:  Judge, the two individuals were together

6    for a period of time before the accident.

7          THE COURT:  During that same day?

8          MR. POCHE:  During the same day.

9          April 24th -- if you take a snapshot of the cellphone

10   records on April 24th, you'll see over 20 calls between

11   Antoine Clark and Ryan Harris on the day of the accident.  You'll

12   see numerous calls between Shirley Harris and Ryan Harris on the

13   day of the accident.

14         THE COURT:  Were any of the calls just before the

15   accident?

16         MR. POCHE:  Yes, Your Honor.

17         THE COURT:  How many and what did the witnesses say

18   about those calls?

19         MR. POCHE:  Antoine Clark denied talking to Ryan Harris

20   on the day of the accident.

21         Shirley Harris admitted to talking to Ryan Harris, and

22   I did not delve into what they talked about.

23         THE COURT:  Then how -- I'm struggling with how does

24   that have to do with whether an accident occurred and how it

25   occurred --

**OFFICIAL TRANSCRIPT**

1          MR. POCHE:  I'm not --

2          THE COURT:  -- other than the fact that these people

3    were talking and they don't want you to know they were talking?

4          MR. POCHE:  Well, I think that goes to the witness's

5    credibility, the fact that he is denying communication with

6    someone that his records indicate he talked to them 20 times on

7    one day in particular.  And I asked him extensively on how he --

8          THE COURT:  But, again, even your line of questioning,

9    like why would you -- why would you be questioning him about who

10   he was talking with if it had no bearing on the accident?

11         You're not telling me something.

12         MR. POCHE:  This is why, Your Honor.  If I -- I just

13   don't know how much information to provide you to try to --

14         THE COURT:  You need to step me through it, because you

15   have to assume I only know what you gave me in writing, and what

16   you gave me in writing --

17         MR. POCHE:  So here's part of -- here's part of the

18   theory or the issue that I have with the case.

19         I asked the three plaintiffs individually, How did

20   y'all get together?  How did y'all meet up?  How did y'all come

21   together to get into the car to drive to the Westbank?

22         All right?

23         All three told me different stories.

24         Kierra Thomas told me she called Shirley Harris

25   randomly a few days before.  Shirley Harris was in the

**OFFICIAL TRANSCRIPT**

1  deposition.

2        When I deposed Shirley, she was like, I don't know what

3  Kierra was talking about.  That's not what happened.  Kierra was

4  coming there to holler at Antoine.

5        So Antoine is in the room.

6        THE COURT:  Who an Antoine?

7        MR. POCHE:  Antoine Clark, the plaintiff.

8        THE COURT:  What's her relationship with him?

9        MR. POCHE:  They were like trying to hook up, but

10  Antoine has a wife or a girlfriend.

11        THE COURT:  So she's a side piece?

12        MR. POCHE:  A potential side piece.

13        THE COURT:  Got it.

14        MR. POCHE:  I'm not going to infer that they were doing

15  anything untoward, Your Honor.

16        THE COURT:  Got it, got it, got it.

17        MR. POCHE:  They were talking.

18        So Kierra said she goes to Shirley's house.  Kierra

19  hadn't seen Shirley Harris in years because she's lived in Texas.

20        I asked Shirley, again who was in the deposition, How

21  did you get to -- How did she know where you lived?  And she

22  said, Well, I didn't talk to her and I wasn't even at my house, I

23  was at my cousin's house.

24        And so Antoine's in the deposition, and I'm like,

25  Antoine, did you talk to Kierra?  He said, No, I've never talked

**OFFICIAL TRANSCRIPT**

1  to her.

2          So everybody is giving me a story about how they got

3  together, and no one will back up the other person.

4          So when Antoine takes the witness -- not the witness

5  stand, the deposition.  I asked Antoine, How did you get there?

6  Antoine said he was randomly at a convenience store nearby --

7          THE COURT:  Wait, say that again.

8          MR. POCHE:  Antoine was randomly at a convenience

9  store.  He ran into Eddie Harris, Shirley Harris' brother.  Eddie

10 said, We're going to a party, why don't you come over.

11         Antoine gets in Eddie's car, goes to Shirley Harris'

12 cousin's apartment.  Hangs out.  Gets back in Eddie's car, goes

13 back to the gas station, gets his car, goes back to Shirley

14 Harris' apartment, and hangs out.

15         Then they all decide that they're going to get into a

16 car when these three people barely know each other -- or knew

17 each other through associates -- and go to a party on the

18 Westbank.

19         So at this point everybody in the --

20         THE COURT:  They're millennials?

21         MR. POCHE:  Ummm...

22         THE COURT:  Because, you know, they do some strange

23 things.

24         MR. POCHE:  They're around 30 each, give or take.  I

25 think Ms. Thomas is a little younger.

**OFFICIAL TRANSCRIPT**

1          THE COURT:  Uh-huh.

2          MR. POCHE:  So everybody's story in the deposition is

3    not making sense on how they got together.

4          THE COURT:  So why does it matter who called -- that

5    the male Harris called the cousin?  Why is that a problem?

6          It sounds like everybody is not being straight with

7    you, I get that, but how does that relate to what happened?

8          MR. POCHE:  That is just one example of communication

9    with someone immediately before the accident and immediately

10   after the accident.

11         If a plaintiff is not being honest about his

12   whereabouts and what he did before the accident, then I believe I

13   have a right to delve into his communications with people who

14   were involved in similar accidents, who weren't on the scene of

15   the accident, who didn't show up on the scene, and the amount of

16   communications that they had with that person immediately before

17   the accident.

18         THE COURT:  I see exactly where you're going.  Let me

19   hear from the opponent.

20         MR. POCHE:  Judge, we still have that --

21         THE COURT:  I know.  I'm just dealing with the

22   requests.

23         MR. POCHE:  Yes, Your Honor.  Thank you.

24         THE COURT:  Uh-huh.

25         MS. MOTTA:  Good morning, Your Honor.

**OFFICIAL TRANSCRIPT**

1          THE COURT:  Good morning.

2          What's your position on the requests for admissions,

3    ma'am?  Because it seems to me y'all screwed up.

4          The requests were propounded more than 30 days ago.

5    Whether I agree with the subject matter or not, the law provides

6    that if there is no response, they're deemed admitted.  And why

7    should they not be and by what authority can I say they're not if

8    the time clock has run?

9          MS. MOTTA:  I actually did answer to the admissions.

10   The question is that it wasn't enough for him.

11         THE COURT:  No, no, no, no, no.

12         MS. MOTTA:  The admissions --

13         THE COURT:  Let me ask you a different question,

14   because when I looked at this last night, the answers to the

15   requests for admissions occurred on March 4th.

16         When did you propound them?

17         MR. POCHE:  They were propounded on December 18, 2018.

18         THE COURT:  So by December -- by January 18th they were

19   deemed admitted.  The fact that you responded in March timed you

20   out.

21         MS. MOTTA:  Prior counsel actually did answer them and

22   then I answered them after.

23         THE COURT:  Show me the previous counsel's response.

24         Because the only response I saw appended to the

25   motion --

**OFFICIAL TRANSCRIPT**

```
 1              MS. MOTTA:  Yes, Your Honor.
 2              THE COURT:  -- and your response was a response that
 3   occurred in March.
 4              Do you have one that was before March?
 5              MR. POCHE:  Judge, there was the second set of
 6   interrogatories, the one that --
 7              THE COURT:  No, I'm talking requests for admissions.
 8              MR. POCHE:  Those were answered by prior counsel.
 9              THE COURT:  Uh-huh.
10              MR. POCHE:  The third set that we were just talking
11   about were not answered by prior counsel.
12              THE COURT:  I'm just talking about requests for
13   admissions.
14              MR. POCHE:  They were not answered by prior counsel.
15              THE COURT:  Show me the requests for admissions that
16   you said preexisted you, because otherwise he wins on that.  And
17   I don't really have to strike the answers because the law says
18   you can ignore them and deem them admitted.
19              MS. MOTTA:  One second, Your Honor.
20              What was the date of the admissions?  Because I'm
21   looking through Jason's folder, not mine.
22              THE COURT:  Take your time.
23              MR. POCHE:  I think they were on December 18th.
24                              (A pause in the proceedings.)
25              THE COURT:  Can't find it, can you?
```

**OFFICIAL TRANSCRIPT**

```
 1          MR. POCHE:  The problem is I have two different
 2   Dropboxes, Your Honor, so I have prior counsel's and then I have
 3   to look at mine to see when they transferred over.
 4          Because what happened was when things were being sent
 5   to Jason, not everything was being sent to me as well.  So when I
 6   got the file after he withdrew, there were things that were not
 7   there.  So that's why I got copies of the admissions and
 8   everything immediately after to then answer just in case there
 9   was anything --
10          THE COURT:  Well, I need to know if there was some
11   prior response, because otherwise he wins on that one.  It's
12   deemed admitted by operation of law.
13                                  (A pause in the proceedings.)
14          MS. MOTTA:  If you don't mind, Your Honor, I could have
15   my office look while I'm here so we don't take the time of --
16          THE COURT:  Yeah, you can do that.  Do you want to call
17   them or something?
18          MS. MOTTA:  If you'd give me a moment, Your Honor.
19          THE COURT:  Yeah, sure.  That's fine.
20                                  (A pause in the proceedings.)
21          MR. POCHE:  Judge, may I ask a question?
22          THE COURT:  Sure.
23          MR. POCHE:  On the 7.4 ruling, was there not a
24   memorandum attached?  Is that the issue?
25          THE COURT:  The memorandum was attached but the rogs
```

**OFFICIAL TRANSCRIPT**

1  weren't.

2          MR. POCHE:  And the proposed pleading?

3          THE COURT:  So I couldn't even evaluate them.

4          MR. POCHE:  Understood.

5          THE COURT:  Right.  That doesn't mean you don't get to

6  do it again, but that's why.

7                              (A pause in the proceedings.)

8          MS. MOTTA:  I have them looking.

9          THE COURT:  Okay.  Cool.  So let's talk about the next

10 one.

11         MS. MOTTA:  But I will say, Your Honor, that we

12 actually had communication when the file came over to me, and he

13 actually said he would be willing to give me an extension.  And

14 when he gave me an extension, I did propound the admissions.

15         So that --

16         THE COURT:  He's saying no.

17         MR. POCHE:  Part of that conversation is accurate.  I

18 did have a conversation about Ms. Motta being transferred the

19 file.

20         We had the Rule 37 conference, according to my notes

21 and the correspondence, on January 25, 2019.  I gave her a

22 two-week extension.

23         THE COURT:  Yeah, but that was limited to the third set

24 of interrogs, the second requests for admissions, and the fourth

25 request, correct?

**OFFICIAL TRANSCRIPT**

1          MR. POCHE:  Yes, ma'am, which is the substance of

2   your -- what you're asking Ms. Motta right now.  But I gave her a

3   two-week extension.  That would have been -- they would have been

4   due on about the second week of February.

5          THE COURT:  Right.

6          MR. POCHE:  We didn't file a motion until

7   February 19th.  She did not respond until --

8          THE COURT:  March 4th according to the certification I

9   read.

10          So that's resolved and deemed admitted.

11          I don't know that my statement changes the impact,

12   but -- because I don't think it really requires a statement by

13   the Court in that respect.

14          So now let's talk about -- let's see here.

15          Let's talk about this Rule 37 compliance, because only

16   as to the social media do you say that y'all didn't talk about

17   that, right?

18          MS. MOTTA:  We talked very vaguely, but not -- I object

19   to the fact that it was not related to the case, and where he was

20   going --

21          THE COURT:  Why would it not be related to the case?

22          MS. MOTTA:  Because he was very broad with everything.

23   He wanted so many things, and he didn't give me any

24   opportunity -- he didn't limit it.

25          So what I'm asking the Court is that -- the Facebook

**OFFICIAL TRANSCRIPT**

1   page is public.  He is welcome to, like, scroll down, which I'm

2   sure he has, and --

3           THE COURT:  No, y'all can download it.  He can ask for

4   you to download it.

5           MS. MOTTA:  And I have downloaded it in this case that

6   we have to do the limitations on it.  What he was asking for was

7   so far and beyond what's related to the accident, so my

8   question --

9           THE COURT:  Why didn't you just object to it rather

10  than delay it?

11          MS. MOTTA:  I did.

12          THE COURT:  In writing?

13          MS. MOTTA:  I did, Judge.  I did answer him and --

14          THE COURT:  You preserved your objection?

15          MS. MOTTA:  Yes.

16          THE COURT:  Let me see.

17          But here's the deal:  When did y'all talk about it?

18          Because your certification that you talked about it

19  doesn't reference it in it.  The January 25th --

20          MR. POCHE:  Yes, Your Honor.

21          THE COURT:  -- doesn't say anything about y'all

22  discussing it.  It says -- the one on the 22nd said that you

23  planned on talking about it, but your confirmation of what y'all

24  talked about and the extension only referenced the other stuff,

25  which led me to believe that you didn't even have a conversation,

**OFFICIAL TRANSCRIPT**

1  which is what your position was, and I agreed with you until you

2  just opened your mouth and said otherwise.

3          MS. MOTTA:  I think -- I'm sorry, Your Honor.

4          THE COURT:  No, no, no.  You were going to win on that

5  issue, because when I read the 37 certification by him, it did

6  not reference RFP 17.

7          MS. MOTTA:  No, that 37 was not when we discussed it.

8  It was on another matter and it was like a broad thing.

9          THE COURT:  Right.

10         MS. MOTTA:  It was a time of 10:00 a.m. -- whatever,

11  blah, blah, blah.

12         THE COURT:  Because when I looked at the 37, I said,

13  Oh, he meant to do it but he forgot.  And then his certification

14  says we only talked about this, and you got an extension on this.

15  So I don't think you tee'd that one up right.

16         MR. POCHE:  Your Honor, Exhibit 5 is the actual Rule 37

17  regarding the Request For Production No. 17.

18         THE COURT:  I saw that.

19         MR. POCHE:  And you will see where I say:  Pursuant to

20  our Rule 37 conference, please see below.  I'll provide a

21  two-week extension.  I have it in front of me and I can --

22         THE COURT:  It says:  Pursuant to our Rule 37

23  conference, I will provide a two-week extension prior to seeking

24  Court intervention for the third set of interrogatories, the

25  second requests for admissions, and the fourth request for

**OFFICIAL TRANSCRIPT**

1    production of documents.  It makes no reference to RFP 17.

2            MR. POCHE:  May I approach?

3            That's Exhibit 5, Your Honor.

4            THE COURT:  This is a different one at 9:51.

5            MR. POCHE:  I sent separate e-mails in case I had to

6    file a different motion to compel.

7            THE COURT:  Okay.  You gave me this one, too?

8            MR. POCHE:  Yes, Your Honor.  That is Exhibit 5 to my

9    motion.

10                              (A pause in the proceedings.)

11            THE COURT:  Okay.  All right.  I stand corrected.

12            So you gave her --

13            So why do you say y'all never talked about it if he

14    backed it up with this e-mail to you?

15            MS. MOTTA:  All he did was bring up that comment, which

16    I said I objected to.  I said it's the same objection.  Never did

17    we have a conversation as to what the objection was for and what

18    he was specifically asking or trying to change, instead of

19    wasting the Court's time.

20            He was going back to the nine factors.  It was

21    literally brought up --

22            THE COURT:  Nine factors?

23            MS. MOTTA:  Or the eight factors that he wants instead

24    of limiting it to --

25            THE COURT:  So did you -- let me ask you -- stand up.

**OFFICIAL TRANSCRIPT**

1        Did you have a discussion about the scope of the

2  request?

3        Because the way this is written, all you did was

4  regurgitate your original request, which is really not what the

5  rules contemplate.

6        Like you say, I want it.  She says, I can't give it to

7  you.  And you say, Okay, fine, I'm going to file a motion.

8  That's not working to resolve the problem.

9        MR. POCHE:  I have a different memory of the

10  conversation.

11        THE COURT:  So tell me your memory of the conversation.

12        MR. POCHE:  My memory is that original counsel,

13  Mr. Baer, was taking the lead on the case.  He withdrew.  I was

14  not happy with Mr. Baer's original response.

15        THE COURT:  What was his response?

16        MR. POCHE:  "Objection."

17        THE COURT:  Okay.  That was the one of not relevant

18  stuff that I read or something like that?

19        MR. POCHE:  I can look it up, but I don't remember

20  exactly.  But it was numerous objections.

21        I responded by saying, I'd like a Rule 37 with

22  Ms. Motta at that point.  We had a conversation.  She said she

23  would get the information and provide it.  That is my memory of

24  the conversation.

25        Now, whether she was going to still object to it, I

**OFFICIAL TRANSCRIPT**

1    didn't go into detail, but my understanding was she was --

2            THE COURT:  You thought you had fixed the problem?

3            MR. POCHE:  I thought she was going to get it.

4            THE COURT:  But see, here's the deal.  This doesn't say

5    that.

6            MR. POCHE:  But, Your Honor --

7            THE COURT:  This doesn't say, I'm glad we had the

8    conversation and thank you for agreeing to produce this

9    information and I'll give you two weeks to do it.

10           MR. POCHE:  The conversation was that she could redact

11   what she believed -- recently in front of Judge North, there was

12   a ruling where a similar set of requests for production was

13   ordered.  Ms. Motta was going to review those documents for

14   information which was privileged, not relevant, and not related.

15   She was then going to produce the remainder of the Facebook

16   discovery to me.  Our conversation --

17           THE COURT:  This is not limited to Facebook, by the

18   way.

19           MR. POCHE:  I apologize, Your Honor.  Social media.

20           The conversation we had was --

21           THE COURT:  Social media -- do you know what social

22   media the plaintiff uses?  Did you ask that question?

23           MR. POCHE:  Do I know?  Yes, Your Honor.

24           THE COURT:  What is it?

25           MR. POCHE:  She uses Facebook and Instagram.

**OFFICIAL TRANSCRIPT**

1          THE COURT:  Okay.  So this should have been tailored to

2   that for somebody like that me that doesn't know what the person

3   uses.

4          But go ahead.

5          MR. POCHE:  The conversation was along the lines of

6   give me the same thing that Judge North ruled.  Just give me

7   whatever you think is relevant, let me look at it, and then we

8   can go back -- we can go to court if we need to.

9          My issue was I got --

10         THE COURT:  What was her response?

11         MR. POCHE:  I got no response until after I filed the

12  motion -- actually, no, Your Honor.  I got no response after that

13  conference.

14         THE COURT:  Okay.

15         MS. MOTTA:  The conversation was I would look at the

16  answers as to what Jason did.  That was my answer.  Because he --

17         THE COURT:  Who's Jason.

18         MS. MOTTA:  The counsel previous.  I'm sorry.

19  Mr. Baer, he was the counsel before.

20         And the objection that he had was the same.  Since

21  there, we never had another conversation about it, nor the

22  limitations.

23         Now, when he's talking about Judge North --

24         THE COURT:  How can y'all have a completely different

25  recollection of a conversation that each of you claim to have

**OFFICIAL TRANSCRIPT**

1  participated in, which is not documented by any piece of paper at

2  all?  This doesn't document it at all.

3         So how are y'all going to resolve this?

4         Because, quite frankly, I think you're wasting my time.

5         What's your proposal?  Because I've read you had a

6  proposal.

7         MS. MOTTA:  The proposal is to follow the guidelines of

8  what has been more limited to Facebook as far as the six factors.

9  I believe it's where it's related to the case at hand from --

10         THE COURT:  He's saying he don't care.  You make the

11  assessment, you give it to him, and he'll take what you did.  And

12  when I read it last night, I'm saying, So why didn't she do

13  anything between now and then?

14         MS. MOTTA:  Oh, I --

15         THE COURT:  Why haven't you given him some production

16  between now and then?

17         MS. MOTTA:  I have been downloading everything.  This

18  is a mom who has four kids that have dancing.  I've been watching

19  over 600 downloads -- I'm not exaggerating.  There are 600

20  videos, and being a solo practitioner, it has been extremely time

21  consuming.

22         THE COURT:  Rolling production.  Rolling production.

23         Have you run across anything post-accident that could

24  be construed as relevant?

25         MS. MOTTA:  As of now, no.  I'm still going through

**OFFICIAL TRANSCRIPT**

1  videos.  I have about 28 videos to go.  And --
2          THE COURT:  But I don't think it's limited to videos.
3  I think --
4          MS. MOTTA:  No, I've done pictures.  The pictures are
5  good.  There's nothing related.  There's nothing related to the
6  pictures.
7          This is why I was offering where her Facebook is
8  public.  If he finds something --
9          THE COURT:  What's her name?  Let me call her up.
10          What's her name?
11          MS. MOTTA:  Shirley Harris.
12          MR. POCHE:  Shirley Mae, M-a-e, Harris.
13          THE COURT:  Have you run a query on her Facebook?
14          MR. POCHE:  Yes, Your Honor.  It's public.
15          The issue -- and I apologize for talking too low.
16          The issue is that I don't know what she's messaging.  I
17  would like the messages reviewed to see if she --
18          THE COURT:  Have you looked at the messages?
19          MS. MOTTA:  I have looked at the messages.  There is
20  nothing that's related to the accident.
21          There is "happy birthday" and "I'm so proud of your
22  daughters" because she owns a dance studio -- or she runs a dance
23  studio, one or the other.  I think she manages.  And there they
24  all do dance team.  So everything you look at, it's things that
25  are related to dance team, dance team, dance team.

**OFFICIAL TRANSCRIPT**

1          So I have from -- about 20 videos from the date of the

2    accident down.  So about the last --

3          THE COURT:  So maybe I should ask this question:  Are

4    the videos of her?

5          MS. MOTTA:  No.  Ninety-five percent of her videos are

6    of her kids and the dance team.

7          THE COURT:  All right.  Are any of the videos of her?

8          MS. MOTTA:  Like I said, I still have like 25 or 28

9    videos.

10         THE COURT:  That you've looked at.  Let me rephrase.

11         MS. MOTTA:  Of her like saying "hi" or talking in the

12   car.  Nothing of --

13         THE COURT:  Well, that would be relevant for him.

14         MS. MOTTA:  Her sitting in the car, like in the

15   passenger seat?

16         THE COURT:  He gets to assess how she looks.  Isn't

17   there an issue of --

18         MR. POCHE:  She's had cervical surgery.

19         THE COURT:  Yeah.  She might be doing this.

20         I mean -- so I hear what you're saying.  I'm not

21   comfortable with your review, then, if --

22         MS. MOTTA:  Well, I --

23         THE COURT:  Hold on.

24         MS. MOTTA:  Listen, I am happy to provide all of the

25   videos if you want to screen it, because it's -- literally when I

**OFFICIAL TRANSCRIPT**

1  tell you 600 videos, I'm happy to do it.  I have nothing to hide

2  on it.  And that's why I'm saying it's public.  If they find a

3  video that they want and then they say is this her and --

4          THE COURT:  Your client said it's okay to give up all

5  her personal information that's not related to her case?

6          MS. MOTTA:  No, no, no.  I'm saying if that's what's

7  deemed as necessary --

8          THE COURT:  I didn't say that.

9          MS. MOTTA:  I'm saying if you want to look at the

10  public page -- because it is public, everyone has the right to do

11  it -- and they find a certain video --

12          THE COURT:  That's true.

13          MS. MOTTA:  -- and they want her to certify it, I'm

14  happy to do that, because --

15          THE COURT:  Let me ask a different question.  Have you

16  looked at everything on her page?

17          MR. POCHE:  I've looked at it, Your Honor.

18          THE COURT:  Do you agree with her assessment that the

19  videos that she has looked at are not relevant?

20          MR. POCHE:  No, Your Honor.

21          THE COURT:  You have seen some relevant videos?

22          MR. POCHE:  Yes, Your Honor.

23          THE COURT:  Identify the ones you want her to produce

24  for you, because you've already seen them.  You already have

25  possession of them.

**OFFICIAL TRANSCRIPT**

1    MS. MOTTA:  There's like 28 of them left so I don't

2  know.  And I'm going from the oldest -- I mean, from the most

3  present to the accident.  I'm going backwards.  So please forgive

4  me.  I'm not saying that I'm fabricating or fraud or anything --

5  lying or misrepresenting it.  I just have not seen the videos

6  yet.

7    MR. POCHE:  Your Honor, during Ms. Shirley Harris'

8  deposition, I asked her if she went to Surge and she basically --

9    THE COURT:  If she went to where?

10    MR. POCHE:  Surge.  The jump place in Metairie.

11    THE COURT:  What's Surge?

12    MR. POCHE:  The jump place in Metairie.

13    THE COURT:  I've never heard of it.  I'm sorry, I

14  should get out more.

15    MR. POCHE:  Well, I don't think it's -- well, I

16  actually have fun there.  But it's like a trampoline-style place.

17    THE COURT:  Oh, okay.

18    MR. POCHE:  They have a part where you can joust.  You

19  know, like fake --

20    THE COURT:  Uh-huh.  Uh-huh.

21    MR. POCHE:  Like gladiator style.  Do you know what a

22  gladiator is?

23    THE COURT:  Yeah, yeah, yeah, yeah.

24    MR. POCHE:  Ms. Harris and her husband, I'm not saying

25  they're going out like smacking each other, but they're jousting

**OFFICIAL TRANSCRIPT**

1  in the video.

2       MS. MOTTA:  I have not seen that video.

3       MR. POCHE:  That would be a video that happened -- I

4  think I even asked Ms. Harris during her deposition -- July of

5  2017, and I don't remember what her answer was.  But those are

6  the types of videos.

7       And like Your Honor said, movements.  Ms. Harris

8  claimed a significant neck movement issue during her deposition

9  in October.

10       I have not looked at all the videos.  I've looked at

11  some of them.  I have preserved some of them.  But I have not

12  looked at every video on Ms. Harris' account.  I have propounded

13  discovery.

14       THE COURT:  I'm listening.

15       MR. POCHE:  I can identify some.

16       But I disagree that Ms. Harris -- Ms. Harris is

17  claiming physical pain and suffering and emotional distress.  She

18  is claiming that this basically ruined her life.  I disagree.

19       And that's getting into the relevancy objections and

20  all that stuff.  I disagree that her taking 600 videos of her

21  children is not relevant.  I don't want the videos, but maybe the

22  posts without the video.  Ms. Harris has continued to lead her

23  life.  She's continued to have a family life.

24       THE COURT:  The posts without a video?  The fact that

25  she can use her fingers to post on Facebook?

**OFFICIAL TRANSCRIPT**

1      MR. POCHE:  That her family life has not been
2  deteriorated by this accident.
3      THE COURT:  So the fact that I can do this means my
4  family life has not deteriorated?  Are we really going there?
5      MR. POCHE:  No, Your Honor.
6      MS. MOTTA:  And, Your Honor, she's posting pictures of
7  the dance team, I mean, here and there.  But she's been very
8  limited.  And she hasn't said she can't do anything.  She just
9  says it hurts more.
10      I mean, a person -- listen, Your Honor, I had a double
11  cervical fusion at my young age, and it hurts when I have to pick
12  up my child still.  It doesn't mean I'm not going to hug and kiss
13  and hold her and take her to Disney World.  It just means that
14  when I get back, oh, goodness it's going to hurt and I'm going to
15  need to see the doctor, but it doesn't mean I'm going to stop my
16  life.  But does it deprive me of --
17      THE COURT:  Here's the problem.  Don't you have the
18  same posts?
19      MR. POCHE:  No, Your Honor.
20      THE COURT:  Why not?
21      MR. POCHE:  This is the problem with Facebook, for
22  instance.  You can delete a post from the public view.  You can
23  remove a comment from the public view.
24      THE COURT:  So what you're saying is I can see some
25  things, but I don't know what's been altered or what has been

**OFFICIAL TRANSCRIPT**

1  restricted, is what you're saying?

2          MR. POCHE:  That's number one.

3          THE COURT:  Right.

4          MR. POCHE:  Number two is that I, as the defendant, do

5  not believe I should be the one to have to get Ms. Harris to

6  certify her Facebook page.  I've asked in discovery --

7          THE COURT:  No, but I have -- I have had defense

8  counsel tell plaintiff's counsel what you want, and then they go

9  look for what you want, and you get it, as opposed to leaving it

10 up to them to figure out what, from their perspective, is

11 relevant.  Because that's never going to work because they're

12 never going to think what you think is relevant.

13         MS. MOTTA:  And that's --

14         THE COURT:  So I think that your approach is wrong.  I

15 think that you know what you want, right?

16         For example, if I were you -- I can't tell you how to

17 practice or develop your case -- I would want to know if there

18 are either photographs or videos of her vacationing, right?

19 Because vacationing would be suggestive of I ain't hurting that

20 bad, I'm living my best life.  Because you know how people do

21 when they have these online posts?

22         So this is what I want y'all to do with this, because I

23 think y'all can work through this.  And what you can't fix, I'll

24 fix.

25         I want you, Counsel, to sit across the table from your

**OFFICIAL TRANSCRIPT**

1  opposing counsel and give her a list of things that will, in your

2  mind, potentially be evidence that she's not as bad off as she

3  says and what that looks like from you.  So that as she is

4  looking at the page, she knows what you mean.

5          And much like she said there's a video of her in the

6  car, well, to me that's relevant, to her it wasn't.  But if it's

7  to you relevant, her doing anything other than laying down, going

8  to the doctor, or taking a pill that shows her functioning --

9  right -- might be stuff that you consider relevant which she will

10  then look at it from that lens and produce.

11          MR. POCHE:  Yes, Your Honor, I will do that.

12          THE COURT:  And I will give a compressed time.  I

13  understand you have a lot to look at, but we don't get to know

14  how much online life our clients seem to share with the world.

15  It sounds like yours shares more than she probably should.

16          So I don't think y'all have really had the conversation

17  on specifically -- because the way it's written, it says

18  "inconsistent with her alleged damages," which means she has to

19  think about what you think is inconsistent with what her client

20  says, which is a pretty twisted way of getting what you want.

21          Tell her what you want and I will make her give it to

22  you.  Okay?

23          MR. POCHE:  Yes, Your Honor.

24          THE COURT:  All right.

25          And I'm going to ask them -- by the way, y'all are

**OFFICIAL TRANSCRIPT**

1  going to sit here and do that today, too.  I'm sorry, I don't

2  think I was clear on that.

3          MS. MOTTA:  Yes, Your Honor.

4          MR. POCHE:  Understood.

5          THE COURT:  And then what I'm going to do is take what

6  y'all agree to and put it in my order, right, so that we're all

7  on the same page.  So if there's a problem, then I can figure out

8  who is on the wrong side of the issue.

9          Because, see, the way this is written, it would be hard

10  for me to figure out who's doing what right or wrong.

11          MS. MOTTA:  Yes, Your Honor.

12          And with that, Your Honor, I would just say on the

13  record, I will do a certification of what is not related from

14  what I've seen, as far as her private messages, because you

15  cannot see that as far as public.  But I have looked at every

16  single message, and there is nothing related to the accident.

17          THE COURT:  Well, but see, you have to talk to him

18  about that, right?

19          MS. MOTTA:  Okay.  I thought you were just talking

20  about photos and videos together so I just wanted to put that on

21  the record.

22          THE COURT:  I'm saying everything that's out there in

23  the ether on her, right, because I don't know that the messages

24  that you read -- you're saying from subject matter are not

25  relevant to the claim.  My guess is this -- and I'm just

**OFFICIAL TRANSCRIPT**

1  brainstorming here -- if she's sitting at the computer for hours
2  out of a day with a cervical fusion and you see a series of
3  messages within seconds, sometimes minutes, of each other for
4  extended periods, I could see that, from his perspective, that
5  might be relevant.  Right?  Because it means she's functioning
6  better than what she's contending.
7        And I know your position is, well, she's just working
8  through the pain.  Well, that's the issue for the jury to decide,
9  not for you to decide.
10        So I hear you on your assessment.  I question it, not
11  having read what you read, not having looked at the timing of the
12  communications or the frequency of the communications, which is
13  why I want y'all to sit across from each other, because
14  otherwise, you know, we are in the business of communications and
15  when we don't do it well, bad things happen.
16        MS. MOTTA:  Yes, Your Honor.
17        THE COURT:  So I dealt with the admissions.
18        Y'all are going to give me a conclusion on the social
19  media because there's no question it is discoverable.  It's a
20  scope issue.  And I do think, the scope -- although it said
21  "related to the accident," it still is not tailored enough for
22  the producing party to understand what you're asking for in the
23  context of how social media appears.
24        So y'all are going to do that today while I'm in my
25  *en banc* meeting, and then I'll come back and hear from you-all as

**OFFICIAL TRANSCRIPT**

1   to what you agreed to.  Or if you have questions that I might be

2   able to assist you with, then I will address them at that time.

3           What else do we have?

4           I saw -- didn't you subsequently respond to the

5   discovery, right?  The -- was it the second request for

6   production?

7           MR. POCHE:  That was --

8           THE COURT:  March 4th, right?

9           MR. POCHE:  Yeah.  She did respond.  I believe there

10  was only one request for production of documents --

11          THE COURT:  Yeah, I saw that.

12          MR. POCHE:  -- to Ms. Harris.  It was regarding a

13  letter from Enterprise.

14          THE COURT:  That she said -- the lawyer says I don't

15  have -- the lawyer says that the client didn't have it is what I

16  read, right?

17          MR. POCHE:  Yes, Your Honor.

18          THE COURT:  So to me that was satisfactory although

19  untimely.

20          I don't know -- when did you get in the case and

21  Mr. Baer get out of the case?

22          MS. MOTTA:  I was always on the case.  However, due to

23  me being a solo practitioner it's been where they have been the

24  lead counsel, and things that have -- where I'm needed -- you

25  know, really needed or for a conference or anything where all

**OFFICIAL TRANSCRIPT**

1  parties are going to be, say, in front of the judge where I have

2  to be present, then I'm present.  But usually I'm on the back

3  end.

4      THE COURT:  Yeah.  So are you monitoring?  Were you

5  monitoring what he did or were you just trusting that somehow

6  stuff was going to get done?

7      MS. MOTTA:  More so trusting.

8      THE COURT:  Oh, Lord.

9      MS. MOTTA:  However, my e-mails for some reason, when

10  they switched over to review everything as to what was going on,

11  did not transfer over correctly on the server, and that's why

12  there were a lot of times where I would have to, like, ask

13  defense to resend me things, because it was not put into Dropbox

14  from prior counsel or in my e-mail anymore.  So it was a bit of a

15  mess for that, and I do apologize.

16      THE COURT:  To him, not me.

17      MS. MOTTA:  Oh, I have.  And to his assistant for

18  having her resend things to me.

19      THE COURT:  What is the -- do you have any other issues

20  or did I address them?

21      MR. POCHE:  I believe you have ruled on everything,

22  Your Honor.

23      THE COURT:  Okay.  So I don't really think that Rule 37

24  was a Rule 37.  But in reading what you said you would do, I

25  think y'all need to sit and talk about what you really expect to

**OFFICIAL TRANSCRIPT**

1  get from that production.  Otherwise, I'm going to see y'all

2  again, because you are not going to trust what you get and you

3  are going to make me look at it, and then I'm going to be mad at

4  both of y'all for making me look at 600 videos.

5          MS. MOTTA:  I do not want that, Your Honor.

6          THE COURT:  I'm just telling y'all I'm going to be mad

7  at both of y'all if y'all make me look at 600 videos.

8          The interrogatories, that motion is going to be denied.

9          Right?  Okay.

10         So y'all sit across the table.  Y'all come up with a

11  plan on what you want so she can know what she's looking for.

12  And then communicate -- if I'm not back from my meeting in time,

13  y'all can wait for me or you can give it to Brian and he will

14  take it and incorporate it in the order.

15         If there are disputes between you with regard to that,

16  just hang back.  I'll come back and give assistance to those.

17         MR. POCHE:  Yes, Your Honor.

18         THE COURT:  My meeting shouldn't be more than an hour.

19         All right.  Thank you-all -- oh, attorney's fees are

20  denied.  Y'all got to talk better to each other.

**CERTIFICATE**

21

22         **I hereby certify this 7th day of September, 2020, that
the foregoing is, to the best of my ability and understanding, a
true and correct transcription of the audio recording of the
proceedings in the above-entitled matter.**

23

24

                              */s/ Mary V. Thompson*
25                           _____
                              Official Court Reporter

**OFFICIAL TRANSCRIPT**